UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHERRI ANNE BUNKER,                    )
                                       )
                Plaintiff,             )
                                       )          2:11-CV-01286-PMP-NJK
        v.                             )
                                       )
FORD MOTOR COMPANY,                    )          ORDER
                                       )
                Defendant.             )
_____)

        Presently before the Court is Defendant Ford Motor Company's ("Ford") Motion to Exclude the Testimony of Thomas Lepper (Doc. #30), filed on October 17, 2012. Plaintiff Cherri Anne Bunker ("Bunker") filed an Opposition (Doc. #37) on December 10, 2012.  Ford filed a Reply (Doc. #40) on December 20, 2012.

        Also before the Court is Ford's Motion for Summary Judgment (Doc. #32), filed on October 17, 2012.  Bunker filed an Opposition (Doc. #39) on December 10, 2012.  Ford filed a Reply (Doc. #41) on December 20, 2012.

        Also before the Court is Ford's Motion for Partial Summary Judgment (Doc. #31), filed on October 17, 2012.  Bunker filed an Opposition (Doc. #38) on December 10, 2012.  Ford filed a Reply (Doc. #42) on December 20, 2012.

**I. BACKGROUND**

        This products liability case arises from an accident involving a 2007 Ford Ranger pickup truck (the "Ranger") that occurred on June 19, 2009.  (Def. Ford Motor Co.'s Mot. for Summ. J. (Doc. #32) ["MSJ"], Ex. A at 2-3.)  At the time of the accident, Plaintiff Bunker was loading her boyfriend's children, seven-year-old Jobe Bowen ("Jobe") and

three-year-old Jonah Bowen ("Jonah"), into the Ranger to take them to Chuck E. Cheese. (Id. at 8.)  The Ranger was parked in the sloped driveway of the home Bunker shared with her boyfriend.  (Id.)  The Ranger's parking brake was not set.  (MSJ, Ex. C at 2, 6.)  It is unclear whether the Ranger's engine was running at the time of the accident.  (MSJ, Ex. A at 8-9, 20, 24 (stating the engine was not running); Pl.'s Opp'n to Ford Motor Co.'s Mot. for Summ. J. (Doc. #39) ["Opp'n to MSJ"], Ex. 4 at 1 (same); MSJ, Ex. B at 17-19 (stating Jobe started the car).)

While Bunker was bending down on the Ranger's passenger side to lift Jonah into his car seat, Jobe climbed into the driver's seat,[1] manipulated the automatic transmission gear shift lever, and put the Ranger into gear.  (MSJ, Ex. A at 8-9, 14.)  The Ranger rolled in reverse down the driveway, and its open passenger door knocked over Jonah, who was then run over by the Ranger's right front tire.  (Id. at 9, 11.)  Bunker attempted in vain to stop the Ranger's movement but was dragged into the street.  (Id. at 9; Pet. for Removal (Doc. #1), Ex. A at 3.)

Jonah survived the accident with injuries.  (MSJ, Ex. A at 9.)  Bunker sustained injuries to  her left shoulder, left foot, and knees.  (Pet. for Removal (Doc. #1), Ex. A at 3; Opp'n to MSJ, Ex. 1 at 1.)  Bunker also avers she suffers from post traumatic stress disorder as a result of the accident.  (Pl.'s Opp'n to Ford Motor Co.'s Mot. for Partial Summ. J. (Doc. #38), Ex. 1 at 1.)

---

[1]   It is unclear how Jobe came to be in the driver's seat and whether the keys were already in the ignition.  According to the police report, "Jobe said that [Bunker] gave him the keys to her truck and told him to start it."  (MSJ, Ex. A at 13.)  In her handwritten Traffic Accident Statement, Bunker stated "Jobe was getting into the back pilot seat of my truck on the driver's side . . . I had the keys in the ignition but the vehicle was not running."  (Id. at 20.)  In her affidavit submitted in support of her Opposition to Ford's Motion for Summary Judgment, Bunker stated "Jobe was supposed to be getting into the back seat and putting on his seatbelt.  Instead, Jobe walked around and opened the door to the driver seat.  While I was placing Jonah in his booster seat, Jobe took the keys from my purse that was sitting on the middle console and inserted the key in the ignition."  (Opp'n to MSJ, Ex. 1 at 1.)  Regardless, this dispute is immaterial to the determination of this case.

The Ranger's ignition has five positions: (1) "Accessory," which allows the electrical accessories like the radio to operate when the engine is not running; (2) "Lock," which locks the steering wheel and transmission gear shift lever and allows key removal; (3) "Off," which shuts off the engine and all accessories without locking the steering wheel; (4) "On," which is the key position when driving; and (5) "Start," which cranks the engine. (MSJ, Ex. E at 156; Opp'n to MSJ, Ex. 8 at 156.)  The Ranger is equipped with a brake shift interlock device that requires the brake pedal to be depressed, when the key is in the "On" position, before the gear shift lever can be moved from "Park."  (MSJ, Ex. A at 9, Ex. C at 5.)  However, the Ranger's gear shift lever can be moved out of the "Park" position without depressing the brake pedal when the key is in the "Off" position.  (MSJ, Ex. A at 9, 26, Ex. E at 156.)  The police report also stated the Ranger's "gear shift lever could be moved out of the 'Park' position without depressing the brake pedal when the key was moved just slightly out of the 'Off' position."  (MSJ, Ex. A at 9, 26.)  The police report noted this is a "safety issue," but stated, "[i]t is unknown whether this is a designed feature or whether it is specific to this particular vehicle."  (Id. at 9.)

According to Ford, the ability to move the Ranger's gear shift lever from the "Park" position without depressing the brake pedal when the key is in the "Off" position is necessary to the operation of the vehicle because it serves "to provide override to allow removal from park in the case of electrical failure."[2]  The Ranger's owner's manual contains a warning stating, "[w]hen the key is in the ignition and in the OFF position, the

---

[2]   Ford represents that this quote is contained in the System Design Specifications at 1.1, p. 6.  Ford states that it attached excerpts of the System Design Specification as Exhibit D to its Motion for Summary Judgment (Doc. #32-4).  However, Exhibit D consists only of a one-page document stating "Exhibit D Filed Under Seal."  Exhibit D was not filed under seal elsewhere in the docket. Bunker does not dispute the proffered evidence.  Therefore, the Court will accept Ford's representation of the quote from the System Design Specification, on the condition that Ford files the relevant excerpt within seven days of the date of this Order.

automatic transmission shift lever can be moved from the P (Park) position without the brake pedal depressed.  To avoid unwanted vehicle movement, always set the parking brake."  (MSJ, Ex. E at 156.)

Ford's expert witness, Hugh Mauldin ("Mauldin"), inspected the Ranger after the accident and concluded that the transmission, shift control mechanism, park lock mechanism, brake shift interlock, and parking brake functioned correctly.  (MSJ, Ex. C at 4-6.)  He further concluded that the "Ranger has no defects or unsafe conditions by design that caused or contributed to this incident" and that the Ranger is reasonably safe because it contains features that would have prevented the accident had they been used, such as the parking brake.  (Id. at 9.)  Mauldin attributes the accident to Bunker's failure to set the parking brake and to supervise Jobe.  (Id.)  As to the sequence of events that set the Ranger in motion, Mauldin opined that Jobe rotated the key to the "On" position, depressed the brake pedal, and moved the gear shift lever out of "Park."  (Id. at 3.)  Mauldin reached this conclusion based on Jobe's statements in a police interview that after Jobe rotated the key, he heard a motor start running and the lights on the instrument panel illuminated, which, according to Mauldin, indicates the key must have been in the "On" position.  (Id.)  However, Bunker's affidavit states that at the time of the accident, Jobe "was too short to push down the brake pedal."  (Opp'n to MSJ, Ex. 1 at 1.)

Bunker's expert witness, Thomas Lepper ("Lepper"), originally inspected the Ranger without the ignition key and concluded that the automatic transmission system and brake shift interlock operated properly.  (Opp'n to MSJ, Ex. 3 at 1-4.)  After Lepper inspected the Ranger, he reviewed the police report and interviewed the investigating officer and the tow truck driver, who informed him of a "design flaw" that would allow the brake shift interlock to release without depressing the brake pedal when the ignition switch was partially turned.  (Id. at 5; Opp'n to MSJ, Ex. 5 at 106.)  Thereafter, Lepper re-inspected the Ranger when he had access to the ignition key and made new findings.

(Opp'n to MSJ, Ex. 3 at 5.)  Specifically, Lepper stated:

> [a] design flaw with the steering column brake/shift interlock became apparent.  With the key moved out of the 'Lock' position and not into the 'Run' position the transmission shifter could be pulled out of 'Park' without applying the brake pedal.  When the key was moved completely to the 'On' position the brake/shift interlock again became functional.

(Id. at 5-6.)  Lepper also concluded that when the key was in the "Accessory" position to enable air conditioning or radio, "the transmission [would] 'slip' with certain movements of the steering wheel and allow[ed] the vehicle to move without depressing the brake pedal." (Id. at 7.)  At his deposition, however, Lepper retracted this conclusion and clarified that the only circumstance in which the Ranger's gear shift lever can be moved out of "Park" without applying the brake pedal is if the key is in the "Off" position.[3]  (Opp'n to MSJ, Ex. 5 at 74, 114-15.)

According to Lepper, "[t]he [role] of the Brake Shift Interlock (known by other names in other manufactured vehicles) should always hold the vehicle in PARK until the brake pedal is depressed" and the driver moves the gear shift lever.  (Opp'n to MSJ, Ex. 3 at 6, Ex. 5 at 111.)  Lepper states that the brake shift interlock was developed to prevent accidents such as this one, and that although the Ranger's system is called "brake shift interlock," it does not always require the brake pedal to be depressed to moved the gear shift lever.  (Opp'n to MSJ, Ex. 3 at 6-7.)  Lepper concluded that the ability to move the gear shift lever out of "Park" without applying the brake pedal is a "design flaw" that "could lead to a dangerous situation such as occurred in this incident."  (Id. at 6; Opp'n to MSJ, Ex. 5 at 71.)  Lepper concluded that "[t]he ability to unlock the shifter without applying the brake pedal directly led to the injuries."  (Opp'n to MSJ, Ex. 3 at 7.)  Lepper stated that his conclusions "are to a reasonable degree of scientific certainty."  (Id. at 8.)

---

[3]   Thus, unlike the police report, it was not Lepper's opinion that the brake shift interlock would release without depressing the brake pedal when the ignition switch was partially turned.

During his deposition, however, Lepper testified that he was not familiar with the history of the development of the brake shift interlock and that he did not conduct a survey to determine how many other vehicles are designed the same way as the Ranger.  (Opp'n to MSJ, Ex. 5 at 74-75, 79, 103, 112-114, 120-21.)  He also testified that he did not know whether the brake shift interlock was required by the Federal Motor Vehicle Safety Standards as of the 2007 model year.  (Id. at 75-76.)  Further, he acknowledged that no manual transmission vehicle would have a brake shift interlock and that in manual transmission vehicles, the driver does not need to have the key in the ignition or to press on the brake pedal to move the gear shift lever out of gear and into neutral.  (Id. at 80.)  After his deposition, however, Lepper prepared a Supplement to Expert Report stating that "[f]urther research on other Ford vehicles and similar Ford Ranger model vehicles, along with my extensive history of vehicles and their operation, revealed that the vast majority of vehicles require that the brake pedal be pressed in order to shift a transmission out of Park regardless of the key position."  (Pl.'s Opp'n to Ford Motor Co.'s Mot. to Exclude the Test. of Thomas Lepper (Doc. #37), Ex. 4 at 1.)

As to the sequence of events that set the Ranger in motion, Lepper testified that the most likely scenario was that Jobe rotated the key to the "Off" position and shifted the Ranger's transmission out of "Park" without depressing the brake pedal and without the parking brake set, causing the Ranger to roll down the sloped driveway and strike Jonah and Bunker.  (Opp'n to MSJ, Ex. 5 at 118.)  But Lepper acknowledged that the accident could have happened in various ways.  For instance, he acknowledged that Jobe could have rotated the key to the "On" position, stepped on the brake pedal, and shifted the Ranger's transmission out of "Park."  (Id. at 118-19.)  He also stated that Bunker could have left the Ranger's engine running, and Jobe could have depressed the brake pedal and shifted the Ranger's transmission out of "Park."  (Id. at 119.)  Finally, he stated that Bunker could have pulled the Ranger into the driveway and only partially applied the parking brake "such that

the truck sat there and cooled for a moment or two, [and] then rolled away." (Id. at 119-20.)

Lepper noted there were no warning stickers in the Ranger "regarding the necessity to set the parking brake whenever the vehicle is parked or . . . regarding the ability to shift the transmission out of park without the brake pedal being pushed." (Opp'n to MSJ, Ex. 4 at 1.)  Bunker and her mother, the Ranger's owner, also stated in their Affidavits that there were no safety warnings on the interior or exterior of the Ranger regarding this issue. (Opp'n to MSJ, Ex. 1 at 1, Ex. 6 at 1.)  Although the Ranger's owner's manual contained a safety warning regarding this issue, both Bunker and her mother stated that the Ranger was purchased used and that it did not come with an owner's manual.  (Id.)  However, Lepper testified that he photographed a page from the owner's manual that he found in the Ranger. (Opp'n to MSJ, Ex. 5 at 72-73.)  Lepper also testified that the Ranger operated in the manner described in the warning in the owner's manual.  (Id. at 73-74.)

On June 10, 2011, Bunker brought suit in Nevada state court against Ford alleging claims for negligence (count one), breach of implied warranty (count two), strict products liability (count three), negligent failure to inspect and warn (count four), misrepresentation (count five), and malice, fraud, or oppression, (i.e., punitive damages) (count six).  (Pet. for Removal (Doc. #1), Ex. A.)  Ford removed the action to this Court on August 10, 2011.  (Pet. for Removal.)  The Court subsequently dismissed Bunker's punitive damages claim per the parties' stipulation.  (Order (Doc. #10).)  Ford now moves to exclude Bunker's expert witness and for summary judgment on all remaining claims.

## II.  ANALYSIS

### A.  Motion to Exclude (Doc. #30)

Ford moves to exclude the expert opinion testimony of Bunker's expert, Lepper, arguing Lepper's opinions do not comport with Federal Rule of Evidence 702.  First, Ford argues Lepper's opinion that the Ranger suffers from a "design flaw" in its transmission

system is inadmissible because Lepper is not qualified to offer this opinion.  Ford contends Lepper is not qualified because he does not have a college degree, the college courses he completed were not in engineering and did not qualify him to speak to the design of an automatic transmission system, and he has no experience in the design of automatic transmissions or their control systems, including brake shift interlocks.  Ford also contends that although Lepper has testified in over 100 cases, only two of the cases involved an alleged transmission defect, and neither of them involved a brake shift interlock.

Second, Ford argues Lepper's opinion is inadmissible because it is not based on a reliable methodology.  According to Ford, Lepper describes how the brake shift interlock operates, which is undisputed and is described in the owner's manual, and then jumps to the conclusion that the system is "flawed" without explaining the methodology Lepper used to reach this conclusion.  Ford contends that "all Mr. Lepper did to come to his conclusion was to speak to a police officer and a tow truck driver."  (Ford Motor Co.'s Mot. to Exclude the Test. of Thomas Lepper (Doc. #30) at 7.)

Finally, Ford argues that Lepper's opinion that the design "flaw" caused the incident at issue is inadmissible because it lacks foundation.  Ford contends that Lepper testified that different sequences of events could have resulted in the accident.  For instance, although Lepper testified that the most likely sequence of events was that Jobe rotated the key to the "Off" position and shifted the Ranger's transmission out of "Park" without depressing the brake pedal, Lepper also acknowledged that Jobe could have turned the key, then braked, then shifted, which would not implicate the alleged design flaw.  Ford argues that Lepper does not provide any facts supporting his opinion that the sequence of events implicating the alleged design flaw occurred as opposed to a sequence of events that does not implicate the design flaw.

Bunker responds that Lepper is qualified to offer his opinion because he has over thirty years of experience as a consultant, inspector, and tester in the automotive industry,

he has over fifteen years of experience as a forensic automotive consultant, and he has expertise in brake systems, transmissions, and mechanical defects.  Bunker further argues, "[h]is testimony will allow the trier of fact to understand just how simple and easy it is for a 2007 Ford Ranger to actually come out of gear with the key off and the vehicle in park." (Pl.'s Opp'n to Ford Motor Co.'s Mot. to Exclude the Test. of Thomas Lepper (Doc. #37) at 4.)  Regarding Lepper's methodology, Bunker argues Lepper derived his understanding of the facts from multiple conversations with Bunker and from two inspections of the Ranger. In his Supplement to Expert Report, Lepper states he also did independent research regarding other vehicles.  Bunker further argues Lepper's "testimony is based on reliable principles and methods, namely that a vehicle should not easily come out of park without the brake pedal depressed in any situation."  (Id.)  Finally, Bunker argues that any statements Jobe made to the police are inadmissible hearsay and that any testimony by police officers or investigators based on Jobe's statements therefore are unreliable.

Ford replies that although Lepper has over thirty years of general experience in the automotive industry, it does not mean he is qualified to offer specific opinions regarding the design of a brake shift interlock or transmission.  Regarding Bunker's argument that Lepper's testimony will assist the trier of fact in understanding how simple it is for the Ranger to come out of "Park" without the brake pedal depressed, Ford replies it does not challenge Lepper's testimony regarding the operation of the brake shift interlock.  Instead, Ford argues it is challenging Lepper's conclusion that the way the brake shift interlock operates renders it "flawed."  As to Lepper's methodology, Ford contends the Court should disregard Lepper's Supplement to Expert Report stating he conducted research regarding other vehicles.  Ford argues the supplemental report is an untimely and improper attempt to repair Lepper's deposition testimony, in which Lepper testified he had not done any research regarding other vehicles, by coming forward with information suggesting Lepper had a methodology to support his opinion on the existence of a design "flaw."  Finally, Ford

argues that because Bunker did not explain what methodology supports Lepper's testimony regarding causation, the Court should grant Ford's motion concerning Lepper's causation opinion as unopposed.

Federal Rule of Evidence 702 permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable.  The trial court acts as a "gatekeeper" to exclude expert testimony that is not both relevant and reliable.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

Testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); see also Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (stating testimony is relevant if it "logically advances a material aspect of the proposing party's case").  To be helpful to the jury, the testimony must be "'tied to the facts'" of the particular case.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993) (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Expert testimony is reliable if it is "based on sufficient facts or data," "the product of reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d).  Reliability is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology."  Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187, 1192 (9th Cir. 2007) (quotation omitted).  The trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at 152.

In Daubert, the United States Supreme Court set forth a non-exhaustive list of factors that may guide a court in assessing the reliability of offered testimony: (1) whether a scientific theory or technique can be, and has been, tested; (2) whether the theory or

technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted.  509 U.S. at 593–94. However, depending on the type of expert testimony offered, these factors may not be appropriate to assess reliability.  United States v. Sandoval–Mendoza, 472 F.3d 645, 655 (9th Cir. 2006) (citing Kumho Tire Co., Ltd., 526 U.S. at 150).  For instance, the Daubert factors may have little application to expert testimony based on personal knowledge or experience.  Id.  In such circumstances, the trial court should not apply the Daubert factors in an "unduly restrictive" manner.  Id.

Whether to admit expert testimony, as well as deciding how to determine the testimony is reliable, lies within the trial court's discretion.  Id.; United States v. Calderon-Segura, 512 F.3d 1104, 1109 (9th Cir. 2008).  The party offering the expert testimony bears the burden of establishing its admissibility.  Lust By & Through Lust v. Merrell Dow Pharms., Inc., 89 F.3d 594, 598 (9th Cir. 1996).

Bunker has not met her burden of establishing Lepper's opinions are admissible, and the Court, in its discretion, will exclude Lepper's opinions.  Although Lepper is qualified by his experience, training, and education to testify as to automotive mechanical failures generally, Lepper has little to no knowledge, training, experience, education, or expertise specifically related to brake shift interlock systems.  Lepper admitted at his deposition that he was not familiar with the history of the development of the brake shift interlock, he did not conduct a survey to determine how many other vehicles are designed the same way as the Ranger, and he did not know whether the Federal Motor Vehicle Safety Standards required the brake shift interlock as of the 2007 model year.  (Opp'n to MSJ, Ex. 5 at 74-76, 79, 103, 112-114, 120-121.)  When asked at his deposition whether he had conducted any survey of vehicles manufactured in 2007 that could be shifted out of "Park" without depressing the brake pedal, or that had an "Off" position, Lepper testified that he

had not.  (Id. at 74-75, 79, 103, 120.)  Although Lepper's supplemental report states he did independent research regarding other vehicles, the supplemental report was disclosed for the first time as an attachment to Bunker's Opposition to Ford's Motion to Exclude, nearly three months after Lepper's deposition.  (Pl.'s Opp'n to Ford Motor Co.'s Mot. to Exclude the Test. of Thomas Lepper, Ex. 4.)  Moreover, the supplemental report was not disclosed until nearly four months after the August 20, 2012 expert disclosure deadline.  (Order (Doc. #18) at 3.)

Additionally, Lepper's testimony is not reliable because it is not the product of reliable principles and methods.  The Daubert factors for determining reliability are not particularly relevant to determining the reliability of Lepper's opinions because his opinions are based largely on his experience, not on scientific experiments he has performed.  However, to be admissible his opinions must have some objective basis to which he may apply the facts of this case.

Besides his interviews of the police officer and the tow truck driver, Lepper's expert report and deposition fail to address any methodology Lepper employed, reliable or otherwise, to conclude that the Ranger's brake shift interlock was "flawed."  Lepper describes how the brake shift interlock operates, which is undisputed and is described in the owner's manual, and then concludes that the ability to move the gear shift lever out of "Park" without applying the brake pedal was a "design flaw" in that it could lead to unintended vehicle movement and that "the ability to unlock the shifter without applying the brake pedal directly led to the injuries."  (Opp'n to MSJ, Ex. 3 at 6.)  But Lepper does not explain the methodology he employed to reach this conclusion.  Even if the Court were to consider Lepper's untimely supplemental report in which he states he conducted research regarding other vehicles, Lepper does not describe what the research revealed or how it demonstrated that the Ranger's brake shift interlock is flawed.  Absent any scientific or technical basis to support his opinion that the Ranger's brake shift interlock is flawed,

1  Lepper's opinions are not based on reliable methodology.  The Court therefore will exclude
2  Lepper's opinions in this matter.

3       **B.  Motion for Summary Judgment (Doc. #32)**

4       Ford moves for summary judgment on all remaining claims, arguing that Bunker
5  cannot prove the Ranger was defective or that any defect in the Ranger or negligence on
6  Ford's part caused Bunker's injuries.  Bunker responds that this case must proceed to trial
7  because she has established all of her claims through Lepper's expert report and
8  supplemental expert report.  Ford replies that it met its evidentiary burden that there is no
9  genuine dispute as to any material fact and that Bunker failed to produce affirmative
10  evidence that a genuine dispute remains for trial.

11       Summary judgment is appropriate if the pleadings, the discovery and disclosure
12  materials on file, and any affidavits "show[] that there is no genuine dispute as to any
13  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
14  56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the
15  governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An
16  issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find
17  for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th
18  Cir. 2002).

19       Initially, the moving party bears the burden of proving there is no genuine issue
20  of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the
21  moving party meets its burden, the burden shifts to the non-moving party to produce
22  evidence that a genuine issue of material fact remains for trial.  Id.  Where a party fails to
23  offer evidence sufficient to establish an element essential to its case, no genuine issue of
24  material fact can exist, because "a complete failure of proof concerning an essential element
25  of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex
26  Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Court views all evidence in the light

most favorable to the non-moving party.  Leisek, 278 F.3d at 898.

### 1. Strict Products Liability (count three)

Ford argues it is entitled to summary judgment on Bunker's strict products liability claim because the Ranger was not defective and unreasonably dangerous. Specifically, Ford argues it is undisputed that the Ranger is not defective and unreasonably dangerous because it performed in the manner outlined in the owner's manual, regardless of which sequence of actions resulted in the accident.  Ford contends that under the consumer expectations test, a reasonable consumer would expect the Ranger to function in the manner in which the owner's manual explained it would function.

Alternatively, Ford argues that even if the alleged "design flaw" in the brake shift interlock identified by Lepper were a defect, Bunker's strict products liability claim fails because she cannot prove causation.  Ford argues that Lepper testified there were at least two possible sequences of events that could have caused the accident, and that one of the sequences (e.g., Jobe turning the key to the "On" position, depressing the brake pedal, and shifting into reverse) does not implicate the "design flaw."  Ford contends that Bunker cannot provide evidence to eliminate this possible sequence, and that because Lepper's opinion is inadmissible, Bunker cannot provide evidence that the alternative sequence of events involving the "design flaw" (e.g., Jobe turning the key to the "Off" position and putting the Ranger in gear without depressing the brake pedal), caused the accident.

Bunker responds that Lepper's expert report, deposition testimony, and supplemental expert report established to a "reasonable degree of scientific certainty" that the Ranger left Ford's control in an "unreasonable unsafe condition" and that the ability to move the Ranger's gear shift lever out of "Park" without applying the brake pedal caused Bunker's injuries.  (Opp'n to MSJ at 3-4.)

Ford replies that although Bunker argues the Ranger was dangerous, dangerousness is not enough to prove strict liability.  Specifically, Ford argues that to prove

strict products liability, Bunker must prove that when the Ranger left Ford's control it was defective and unreasonably dangerous.  Ford further argues that the fact the Ranger may have become dangerous when misused does not render it defective and unreasonably dangerous, particularly in light of the warning in the owner's manual that explained the brake pedal did not need to be depressed to shift out of "Park" when the key was in the "Off" position.  Finally, Ford contends that the parties agree the Ranger's brake shift interlock functioned as Ford designed it to function and as the owner's manual said it would function.

To establish a strict products liability claim, a plaintiff must show: "(1) the product had a defect which rendered it unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer, and (3) the defect caused the plaintiff's injury." Rivera v. Phillip Morris, Inc., 209 P.3d 271, 275 (Nev. 2009) (quotation omitted).  A product is defective and unreasonably dangerous when "it fail[s] to perform in the manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community." Stackiewicz v. Nissan Motor Corp. in U.S.A., 686 P.2d 925, 928 (Nev. 1984).  Even if a product is faultlessly made, "[a] product may be found unreasonably dangerous and defective if the manufacturer failed to provide an adequate warning." Rivera, 209 P.3d at 275; Yamaha Motor Co., U.S.A. v. Arnoult, 955 P.2d 661, 665 (Nev. 1998).

It is the plaintiff's burden to prove causation in strict products liability cases. Rivera, 209 P.3d at 274-77.  To establish causation, the plaintiff must establish a nexus "between the design defect of the product and the injury—that is, the plaintiff must show that the design defect in the product was a substantial factor in causing his injury." Price v. Blaine Kern Artista, Inc., 893 P.2d 367, 370 (Nev. 1995) (per curiam) (quotation omitted). In failure to warn claims, causation may be established by showing "that a different warning

would have altered the way the plaintiff used the product." <u>Rivera</u>, 209 P.3d at 275.

"Causation is generally an issue of fact for the jury to resolve." <u>Yamaha Motor Co.</u>, 955 P.2d at 665.

Here, Ford's expert, Mauldin, concluded that the transmission, shift control mechanism, park lock mechanism, brake shift interlock, and parking brake functioned correctly and that the "Ranger has no defects or unsafe conditions by design that caused or contributed to this incident." (MSJ, Ex. C at 9.) Mauldin further concluded that the Ranger is reasonably safe because it contains features that would have prevented the accident had they been used, such as the parking brake. Besides Lepper's opinions regarding the design flaw, which, as discussed above, are inadmissible, Bunker fails to identify any other proof in the record raising a genuine issue of material fact that the Ranger was defective and unreasonably dangerous. Because of Bunker's failure of proof, no genuine issue of material fact remains that the Ranger is not defective and unreasonably dangerous.

To the extent Bunker's strict products liability claim is based on a failure to warn, Bunker also did not offer evidence of causation. Bunker averred that she did not receive a copy of the owner's manual because the Ranger was purchased used and that "[t]here were no safety warnings on the exterior or interior of the vehicle indicating that the vehicle would come out of park without the key being on/and or the brake being depressed." (Opp'n to MSJ, Ex. 1 at 1.) However, Bunker did not offer any evidence that a warning on the exterior or interior of the Ranger would have caused her or Jobe to behave differently on the day of the accident or otherwise alter the way Bunker operated the Ranger. The Court therefore will grant summary judgment in favor of Ford on Bunker's strict products liability claim.

///

///

///

2.   <u>Negligence, Negligent Failure to Inspect and Warn, and Breach of</u>
<u>Implied Warranty (counts one, two, and four)</u>

Ford argues it is entitled to summary judgment on Bunker's negligence and negligent failure to inspect and warn claims because Bunker has no admissible evidence that the alleged design flaw caused her injuries.  Ford similarly argues that Bunker's breach of implied warranty claim fails because there is no admissible evidence that the design flaw caused her injuries.

Regarding her negligence claims, Bunker responds that Lepper's expert report, deposition testimony, and supplemental expert report establish "to a reasonable degree of scientific certainty" that Bunker's injuries were caused by the "Ford Ranger and its ability to come out of Park without the key being turned on and the brake pedal being depressed." (Opp'n to MSJ at 4.)  Bunker further argues that Ford was negligent because the Ranger could come out of "Park" with the key in the "Off" position and injure people standing near the vehicle.  Finally, Bunker argues that the Ranger did not come with an owner's manual and that there were no stickers or other warnings that the Ranger could "so easily come out of gear."  (<u>Id.</u> at 5.)

As to her breach of implied warranty claim, Bunker argues Ford breached implied warranties to make the Ranger safe for reasonable use.  Bunker contends that Lepper's expert report has established causation because the Ranger unexpectedly came out of gear when "[t]he engine was not running; nor was the key turned on; nor the break [sic] depressed, yet the vehicle came out of Park causing injuries to [Bunker]."  (<u>Id.</u>)

It its reply, Ford reiterates its argument that Bunker fails to establish causation as to her negligence or breach of implied warranty claims because Lepper's causation opinion is inadmissible.  Regarding Bunker's argument that the Ranger unexpectedly came out of gear when the engine was not running, the key was not turned to the "On" position, and the brake pedal was not depressed, Ford argues this contradicts Lepper's deposition testimony

in which he stated the brake pedal may have been depressed at some point in the sequence of events of the accident.

To succeed on any of her negligence, negligent failure to inspect and warn, or breach of implied warranty claims, Bunker must prove a causal link between the "design flaw" and her injuries.  To prevail on her negligence-based claims, Bunker must demonstrate "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." Klasch v. Walgreen Co., 264 P.3d 1155, 1158 (Nev. 2011) (en banc). Additionally, Bunker's breach of implied warranty claim requires causation as one of its elements. Nev. Contract Servs., Inc. v. Squirrel Cos., 68 P.3d 896, 899 (Nev. 2003) ("[A] plaintiff must prove that a warranty existed, the defendant breached the warranty, and the defendant's breach was the proximate cause of the loss sustained.).

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to Bunker, no genuine issue of material fact remains that Bunker cannot show causation for her negligence, negligent failure to inspect and warn, and breach of implied warranty claims.  Without Lepper's opinions, Bunker has no evidence that a design flaw caused the accident, and Bunker does not point to any other evidence in the record raising a genuine issue of material fact that a design flaw in the Ranger caused her injuries. Moreover, even if the Court were to consider Lepper's opinions, Lepper testified at his deposition that various sequences of events could have caused the accident, at least one of which does not implicate the alleged design flaw, and Bunker does not point to any evidence in the record eliminating this possible sequence.  The Court therefore will grant summary judgment in Ford's favor with respect to Bunker's negligence, negligent failure to inspect and warn, and breach of implied warranty claims.

### 3. Misrepresentation (count five)

Ford argues that although it is unclear whether Bunker's Complaint alleges intentional or negligent misrepresentation, Ford is entitled to summary judgment on

Bunker's misrepresentation claim because Bunker cannot prove that a misrepresentation on Ford's part caused her damages.  Ford further argues that Bunker has not identified any of Ford's representations that are untrue.  Finally, Ford contends that Lepper testified in his deposition the representations made in the Ranger's owner's manual regarding the brake shift interlock's operation were accurate and therefore Bunker cannot prove misrepresentation.

Bunker responds that Ford cites to the Ranger's owner's manual in support of its argument that it "communicated the unsafe situation with the Ford Ranger," but that Ford thought so little of the warning that it placed it on page 156 of the owner's manual.  (Opp'n to MSJ at 6.)  Bunker further argues that she never received an owner's manual and that there were no other warnings on the interior or exterior of the Ranger to warn of the danger.  Bunker does not clarify in her Opposition whether her claim is for negligent or intentional misrepresentation, however, she cites case law regarding only negligent misrepresentation.

Ford's Reply reiterates that Bunker's Opposition does not point to any representation made by Ford.  Ford argues that although Bunker discusses the warning regarding the brake shift interlock in the owner's manual, Bunker does not asset that the information in the owner's manual was false.  Finally, Ford concedes that while Bunker's argument that the warning should have been placed in a more prominent position in the owner's manual may support a failure to warn claim, the warning's accuracy forecloses a misrepresentation claim.

To establish a claim for intentional misrepresentation, a plaintiff must show "(1) a false representation that is made with either knowledge or belief that it is false or without a sufficient foundation, (2) an intent to induce another's reliance, and (3) damages that result from this reliance." Nelson v. Heer, 163 P.3d 420, 426 (Nev. 2007).  For a negligent misrepresentation claim, a plaintiff must show the defendant (1) "supplie[d] false information for the guidance of [plaintiff] in [its] business transactions," (2) without the

"exercise [of] reasonable care or competence in obtaining or communicating the information," (3) that plaintiff justifiably relied on the false information, and (4) damages resulted.  Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1387 (Nev. 1998) (quotations omitted).  "[B]oth intentional and negligent misrepresentation require a showing that the claimed damages were caused by the alleged misrepresentations."  Foster v. Dingwall, 227 P.3d 1042, 1052 (Nev. 2010).  Moreover, both claims require that the plaintiff rely on the misrepresentation to her detriment.  Nelson, 163 P.3d at 426; Barmettler, 956 P.2d at 1387. Thus, regardless of which claim Bunker alleges, both claims require her to establish that Ford made a misrepresentation, that she relied on the misrepresentation, and that her damages were caused by the misrepresentation.

Although it is somewhat unclear, the Court understands Bunker to be arguing that Ford made misrepresentations by omission regarding the Ranger's safety by failing to place warnings regarding the operation of the brake shift interlock on the Ranger's interior or exterior.  Bunker's affidavit states that "[t]here were no safety warnings on the exterior or interior of the vehicle indicating that the vehicle would come out of park without the key being on/and or the brake being depressed."  (Opp'n to MSJ, Ex. 1 at 1.)  Even if Ford's failure to place safety warnings on the exterior or interior of the Ranger constituted a misrepresentation through silence regarding the Ranger's safety or the operation of the brake shift interlock, Bunker does not provide any evidence establishing that she relied on the absence of warnings to her detriment or that her damages were caused by the absence of warnings.  Moreover, the argument that Ford made a misrepresentation by failing to provide warnings contradicts the allegations in Bunker's Complaint, which states that Ford made misrepresentations through positive assertions.  Specifically, the Complaint alleges that Ford "through advertising, labels and otherwise, made to the public certain misrepresentations of material facts concerning the character and quality of the Ranger that the products were entirely safe, proper and fit for their particular use."  (Pet. for Removal,

Ex. A at 7.)  Because of Bunker's failure of proof as to the reliance and damages elements, no genuine issue of material fact remains that Ford's alleged misrepresentation did not cause Bunker's damages.  The Court therefore will grant summary judgment in favor of Ford on Bunker's misrepresentation claim.

### C.  Motion for Partial Summary Judgment (Doc. #31)

Ford moves for partial summary judgment with respect to Bunker's claims for emotional damages.  To the extent Bunker is making a negligent infliction of emotional distress claim, Ford argues that such a claim is barred under Nevada law because Bunker is not related to Jonah by blood or marriage.  Ford further argues Bunker cannot claim her emotional damages as parasitic damages to her own personal injuries because the emotional damages do not flow from Bunker's personal injuries.  Instead, Ford contends that Bunker's emotional damages arose from witnessing Jonah get injured in the accident.

Bunker responds that she "has not and does not contemplate bringing a claim for [negligent infliction of emotional distress] in this case."  (Pl.'s Opp'n to Ford Motor Co.'s Mot. for Partial Summ. J. (Doc. #38) at 3.)  But Bunker argues that she should be allowed to pursue damages for post traumatic stress disorder ("PTSD") because her emotional damages "derived from her being drug [sic] down the driveway by the Ford Ranger and her PTSD derived from her injuries to her shoulder and back."  (Id. at 4.)  Bunker further argues that her PTSD stemmed from her feeling of powerlessness to stop the Ranger once it was set in motion.  Ford replies that Bunker's self-diagnosis that she suffers from PTSD is inadmissible and that it does not show that her emotional damages claims are not secondary to the personal injuries suffered by Jonah.

Given that Bunker concedes that she is not attempting to bring a claim for negligent infliction of emotional distress and that all of her other claims fail for the reasons set forth in this Order, the Court need not reach the issue of whether Bunker is entitled to emotional damages.  The Court therefore will deny Ford's Motion for Partial Summary

Judgment as moot.

**III.  CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Ford Motor Company's Motion to Exclude the Testimony of Thomas Lepper (Doc. #30) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Ford Motor Company's Motion for Summary Judgment (Doc. #32) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Ford Motor Company's Motion for Partial Summary Judgment (Doc. #31) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Ford Motor Company shall file the relevant excerpts of the System Design Specifications within seven (7) days of the date of this Order.

IT IS FURTHER ORDERED that Judgment is hereby entered in favor of Defendant Ford Motor Company and against Plaintiff Cherri Ann Bunker.

DATED:  August 21, 2013

_____
PHILIP M. PRO
United States District Judge